Green, J.
delivered the opinion of the court.
The prisoner was- indicted, tried and convicted in the circuit court of White county, for the murder of Mrs. Polly Hunter, on the 11th day of May last, and had judgment of death pronounced upon him, from which he appealed to this court.
Several objections have been taken to the form of the proceedings, but all the irregularities complained of, are of a trivial character, none of them constituting an objection of a character requiring a serious discussion.
*290 The question of the prisoner’s guilt or innocence, depends altogether upon circumstantial evidence; and it is earnestly and ingeniously urged by his counsel, that the circumstances proved in the cause, are not such as will justify this court in affirming the judgment, and that the prisoner ought to have a new trial.
This leads us to an examination of the facts and circumstances disclosed by the proof in this record. It appears from the testimony of Mary Ann Todd, that on the night of Wednesday the 11th of May, 1842, while the witness, Mrs. Hunter and another lady were sitting in a room,' near a low window in the house of Mrs. Hunter, about an hour in the night, engaged in conversation, a gun was fired without the house, the ball of which passed through the window glass, and struck the deceased in the neck, alittle below the ear, and passing through the neck, produced her death in a few minutes.
On the morning after the murder, as appears from the testimony of William Little, a rifle ball was found in the room, in which Mrs. Hunter was killed, very much mashed. William Daniel proved that he made the bullet moulds for Gideon Anderson’s gun, and had in his possession a bullet that was run in those moulds, and by a mark which the moulds make near the neck of the bullet, he knew that the round bullet in his possession, and the mashed bullet found in the house of the deceased, were run in the same moulds because they were just alike as to the said mark. The bullet which killed Mrs. Hunter, and the bullet which he knows was run in Anderson’s moulds, were weighed and corresponded in weight — he recognizes the balls by the protuberance on each.
The tracks of a man were seen as if approaching the house near the window through which the ball entered and hastily retreating from the house, resembling those made by defendant’s shoes; and at some distance from the house,' tracks of a horse were seen, as if standing tied to a'walnut tree; one of these tracks resembled very much that which the prisoner’s mare makes with one hind foot, which is peculiarly shaped. The prisoner was seen by Scott and John Kirby on the day the murder was committed, near Mrs. Hunter’s house, riding his mare that has the peculiar hind foot. On Tuesday, one day *291 before the murder, the prisoner dined at Anderson’s, as is proved by Frances Clark, and while at dinner talked of buying Anderson’s gun. Shortly after dinner, Anderson, the prisoner, and witness left the house together, and when a short distance from the house, Anderson gave his gun, shot pouch, and ammunition to the prisoner when they separated, and the gun has not been seen since. The witness lives at Anderson’s. James Scott proved that the prisoner came to his house on Wednesday — the evening of which day the murder was committed, and said he was going to John Kirby’s, and that John was indebted to him. John Kirby’s was in the direction of Mrs. Hunter’s. John Kirby proves that prisoner came to bis house on Wednesday, and left there about two o’clock. ■ Prisoner wanted him to see Carter about some money; and said he was going to Snodgrass’ store to buy some shirts: witness persuaded prisoner to buy shirts at the cheap store in town — he said he would get them at Snod-grass’. Witness went with him to the mountain, near Snod-grass’ and left him. Joseph Snodgrass proved, that the prisoner was not at the store, on the Wednesday of the murder. James Snodgrass proves, that his house is near Mrs. Hunter’s. After the prisoner was apprehended, he told Scott that he started from John Kirby’s on Wednesday to go to Snodgrass’ store to buy shirts: that he went to the bench of the mountain, and then concluded he would go home — and get the shirts at Burton’s store which was near him. He said that in returning from Snodgrass’ he went round Scott’s field, and came into the road near Scott’s house — that there was a pathway when he was there a great while ago, and at this time, and that it run in about twenty yards of the fence. This witness states, that some few years ago, the path spoken of by the prisoner, did run in about twenty steps of the fence — but that the fence has been moved out to within a few feet of the path. He also states that the way around the fence along this path is very bad and very little nearer than the good road.
When first arrested, the prisoner enquired what the murder was done with, and being told with a pistol or gun, he said that he had never owned a pistol, and would not know how to shoot one, and that he had not had a gun in his hands in three months. *292 or not since he sold his gun. He said he got home on Wednesday night a little after dark, and saw no living soul on his return home, after he had passed Scott’s. When the prisoner was accused of the murder, he asked witness, if he had a gun, when he passed his house on Wednesday, witness said he had not. William Matlock says, the road from Snodgrass’ store to the prisoner’s house is thickly settled, and that he has made diligent enquiry and can find no one who saw the prisoner returning, home on Wednesday evening.
J ames Snodgrass states, that when he was in the jail measuring the prisoner’s foot after he was arrested, the prisoner asked him, if he saw any signs of heel irons in 'the tracks. The heel irons in prisoner’s shoes were old, and the nails with which they were put on were new. The prisoner then said, the irons were put on the heel of his shoes on Saturday after the murder was committed, and that they had not been on his shoes before for six months. John B. Pointer, the prisoner’s witness proved that he had heel irons on his shoes in April, and that they were the same shoes Snodgrass saw him have on in the jail. Shadrach Price, proves that the prisoner had been at his house, on the Friday, Saturday and Sunday previous to the murder — that he saw him near Anderson’s on Tuesday, and told him that his wife was in search of him, when prisoner said; “they think I am lost, I have not been at home in over a week.” It is ten miles from the prisoner’s to the witness’ house, and twelve miles from the house of the deceased to that of the witness’, and it is twenty miles from the prisoner’s house, to the house of the deceased.
James J. Brown, started to Georgia on the morning after the murder, and passed the prisoner’s house- about 9 o’clock and saw his wife and children digging iron ore, at an ore-bank in the woods. The prisoner was laying there asleep — witness waked him up, and told him he was fixing for some take-in. The prisoner looked bad, and witness thought he saw something wrong in his countenance- — he had not then heard of the murder. Mary Ann Todd lived with Mrs. Hunter, and a few days previous to the murder, saw tracks resembling the prisoner’s in the orchard, which led to the window where the deceased *293 was killed. These tracks did npt suit any of the family’s and w.ere made in a private place, where but few persons passed. Frances Clark who lives with Gideon Anderson, and .is his sister, says the prisoner came to Anderson’s house on Tuesday before the murder, and went to the field where Anderson was at work, they both came to the house and eat their dinner, and were talking about trading about a gun; Kirby wanted to buy Anderson’s gun; Anderson said if he could find his (Kirby’s) cow, it would be a trade. Soon after dinner, Anderson, Kirby and witness started off together; Anderson and witness \vere going to Esquire Welch’s tó a trial. Anderson started, from the house with his gun on his shoulder, when they had gone a short distance from the house, witness being a short distance from Anderson and Kirby, she saw Anderson give the gun to Kirby, with the shot pouch and ammunition, and Kirby left them. They went on to the trial and came home together — Anderson remained at home that night. The next day, Wednesday, the 11th after dinner, Anderson said he was going to Over-ton county, took some provisions, went off, and came home some time in the night, after witness had been asleep. On the next Friday, two days after the murder, Kirby came to Anderson’s and went out to where he was at work — and after awhile they came to the house together and remained with each other a short time. The next day, (Saturday,) Anderson started to Overton, and witness has not seen him since. The gun has not been at Anderson’s since the Tuesday on which he gave it to Kirby. Anderson is a small man, with a small foot, much smaller than the prisoner’s. Lucy Anderson, the wife of Gideon Anderson, corroborates all the facts stated by Frances Clark, except that she was not along when Anderson gave his gun to the prisoner. Joseph Pearson and Shadrach Price, met Kirby Tuesday evening, as he was coming from towards Anderson’s and going towards home — he had no gun — Pearson again met him late in the evening going back towards Anderson’s, riding a small sorrel mare. Kirby and Anderson live five miles from each other, and Kirby lives twenty miles from Mrs. Hunter’s.
Having thus recapitulated the material facts imthis cause, the *294 question is, whether the innocence of the prisoner, is consistent ■with the existence of all these facts and circumstances. The first that we hear of him in connection with this transaction is the fact, that up to the Tuesday before the murder, he had been from home for about a week, without any known cause or business, and without any knowledge on the part of his wife and family as to where he was — insomuch that Price told him his wife was looking for him, and he replied, that they thought he was lost, not having been at home for a week. A man in his circumstances, thus to remain from home, beyond his neighborhood, ranging from five to ten miles for a week, without any apparent or explained business, is not a circumstance usually occurring in the ordinary transactions of life, and is of itself calculated to awaken suspicion.
We next find the prisoner, on Tuesday after dinner, getting Anderson’s rifle gun, and very soon after he received it, he is seen by Price and Pearson, going towards home, having no gun. Now, he either concealed the gun some where in the neighborhood of Anderson’s, or the testimony of Anderson’s sister and wife as to the gun is false. But these witnesses are unattacked by any opposing evidence, and they give a consistent narrative of the transaction. If it be supposed that their relation to Anderson would influence their testimony, still from the connection they disclose as existing between Anderson and the prisoner, any proof they might, make, calculated to implicate the prisoner, would but involve Anderson the more deeply. We, therefore, do not doubt but that the prisoner did receive the gun from Anderson, about noon on Tuesday. Then the enquiry arises, what disposition did he' make of it, he was soon afterwards seen without any gun, and the necessary inference is, that he had concealed it, where he could easily have access to it without being seen — such concealment of the gun, and evident wish not to be seen with one, cannot be accounted for upon the supposition that his purposes were correct, and the use to which he intended applying it was proper. But, upon the supposition, that it was procured to be used in the perpetration of the dreadful deed with which he is charged, his conduct in thus concealing it, is easily explained, as he did *295 not own a gun, and was not in the habit of carrying one; upon the supposition of his guilt, he must have felt that it was important that he should not be seen in Mrs. Hunter’s neighborhood with this gun; if it were concealed near Anderson’s, and Tuesday night were employed in transferring it to the neighborhood of Mrs. Hunter’s residence, he could show himself Tuesday evening without a gun — and he could travel openly the road towards Mrs. Hunter’s the next day, and appear at Price’s and at Scott’s without a'gun, and yet, have it placed so that he could obtain it and be at Mrs. Hunter’s soon after dark.
If it were contemplated by the murderer, to perpetrate the deed in the manner in which it was accomplished, it was necessary for him to be on the spot soon after dark. It was the month of May, and the people in the country at that season of the year, usually retire to bed pretty early at night. If he lived at the distance of twenty miles from the residence of his victim, it was indispensable that much of the distance to the place of the tragedy should be accomplished before night. It was a thickly settled road, and he would be seen in approaching the neighborhood — and if he had been armed with a rifle gun, suspicion would fix upon him as the murderer. It was therefore important that the gun should be conveyed to the spot, some night before the catastrophe was to take place. That Anderson’s gun was the instrument used in perpetrating the murder, there can be no doubt. Daniel, the gunsmith, who dressed the gun, and made the bullet moulds, from a scar in the moulds, •leaving a peculiar mark near the neck of the bullet, and by a comparison of a ball he had in his possession with the mashed one found in Mrs. Hunter’s room, knows the mashed ball was run in Anderson’s moulds. Both balls had the scar or protuberance near the neck; exactly alike, and they were of the same weight. That the mashed bullet found in the room, was the one by which the death was produced, cannot admit of a doubt. It was found next morning after the murder, in the' room where the deceased was killed, in the condition we should expect the ball to be, which had passed through the window glass and the neck of the deceased, striking against the wall on the other side, spending its force and falling to the floor. *296 There was no gentleman resident in the house having or using a rifle, and the distance from Anderson’s (upwards of fifteen miles) renders it almost impossible, that a bullet made in his moulds, and mashed as this one was, should be found in Mrs. Hunter’s room, immediately after the murder, by any other means than that of having been shot from Anderson’s rifle gun. That Daniel knew that these balls were moulded in Anderson’s moulds, he gives us the best reason for being satisfied. He had dressed the rifle and made the moulds, and would most probably try the rifle, after he had bored it out — to do which he must make some balls; and when he delivered the rifle to Anderson, he retained the ball that was produced on the trial, and had kept it, till after the murder was committed, so that he had it to produce and compare with the one by means of which the murder was done.
The conclusion therefore is inevitable, that the death of Mrs. Hunter was produced by means of a bullet shot from Anderson’s rifle. We have seen that the prisoner obtained that rifle on Tuesday, and must have concealed it near Anderson’s. He was seen by Pearson going towards home shortly after he had received the rifle without it — and late in the evening Pearson met him again, riding his sorrel mare and going towards Anderson’s. Why, after havingbeen at Anderson’s that day, and after having been so long from home, was he found returning that way late in the evening, on horseback? His objects and purposes were, and still remain wholly unexplained. Nor has any witness been produced to state where he was on Tuesday night. The fact, that after a week of absence he returned home, got his mare and late in the evening left home on horseback, indicates that he had some unexplained' important object in view — consistently with his innocence, that object cannot be conjectured. But upon the hypothesis of his guilt it was perfectly natural. ’If the gun were to be conveyed near to Mrs. Hunter’s on Tuesday night — the distance made it important that he should be on horseback — and if Mrs. Hunter were to be murdered on Wednesday night, the horse would be wanted to convey him to her neighborhood, as if upon business — and to *297 afford him the means of rapid flight from the scene of his guilt after the deed should be accomplished.
Although we have no account of the prisoner’s place of lodging on Tuesday night, if indeed he lodged any where, yet we find him at Price’s on Wednesday morning after breakfast, ten miles from home, and twelve • miles from Mrs. Hunter’s, stating that he was going to John Kirby’s — about twelve o’clock he was at Scott’s, stating that he was goin.g to John Kirby’s,, saying, John was indebted to him. ■ This was still in the direc-tion towards Mrs. Hunter’s. He left John Kirby’s about two o’clock saying nothing to him about the money he told Scott John owed him, but spoke of Carter owing him money — and saying that he was going to Snodgrass’ store to buy some shirts. He was dissuaded from getting the shirts at Snodgrass’ store, but persisted in his avowed purpose to do so.. John Kirby left him near Snodgrass’ and in the immediate neighborhood of Mrs. Hunter’s — and yet he did not go to Snodgrass’ nor come back to John Kirby’s — but said, after he was apprehended, that he had gone to get shirts at Snodgrass’,-but after he got to the foot of the mountain, he concluded to go home and buy them at a store near home, and that he returned and reached home a little after dark.
In relation to this day’s travel, in the first place it is wholly unaccountable and incredible, that he should have left home Tuesday evening, to go part of the way to a store twenty miles from home to buy two shirts for his boys. The object is inadequate to have induced such conduct. Besides at Price’s and' at Scott’s, he professed only to be going to John Kirby’s, who owed him money; thus stating to them what turns out to be false. John Kirby was examined as a witness, and does not state that the prisoner asked him for money, or that he owed him any; but he does state that when at his house the prisoner professed that his business was at Snodgrass’ store. That statement turns out to be equally false, as is manifest from the fact, that although he was near the store, he did not go there. His excuse for not going is evidently a mere pretence. If he had gone twenty miles to a store to buy two shirts, when other stores were near his residence — and had *298 resisted the argument of John Kirby against his buying them there, persisting in his original purpose — it is not to be believed, that after John Kirby left him, and when he was near the store, he had come so far to deal at, he would suddenly have changed his purpose, turned round and rode home twenty miles, without seeing a single human being. Here then, is the prisoner, the evening of the murder, in the immediate neighborhood of the deceased, with all his pretences,' as he approached the place, shown to be false, and hissubsequent explanation improbable in the highest degree. Consistently with his innocence no explanation can be given of the motives and objects of this extraordinary trip. But if he be guilty, it was necessary for him to have been where he was on that evening, for reasons before stated — and as men, having a guilty purpose, are always apprehensive that they will be suspected, they are prone, to invent and volunteer excuses; and although these excuses, necessarily false, often lead to their detection — yet the natural anxiety to extricate one’s self from a supposed suspicion of guilt, is so strong a feeling, as to impel almost all men accused or suspected of crime, to make an exculpatory statement, which they suppose will be consistent with their innocence. Upon this principle, if the prisoner is guilty of the murder, the necessity of this trip being apparent — his false pretences as to the objects and motives of his journey were natural enough.
He was then on the evening of the murder, near the house of the woman who was killed — every pretence for being there, shown to be false; and the next enquiry is, how, and when did he return home. His own account is, that he returned that evening, arriving at home, alittle after dark. If he had travel-led the ordinary road at the time he says he went home, it is almost impossible but that some person would have seen him— and yet thickly settled as the road is, no one saw him going home, and he asserts he saw no one. ’ But to obviate this difficulty he says, he turned out of the road and travelled a pathway around Scott’s field — being asked how near that path is to the fence, he said it was about twenty yards, and was a pathway, when he was there a great while ago, and this time. Now it is not probable, that a man would turn out of a good road, to *299 travel around a field, along a rugged pathway, unless there was some adequate motive. If the prisoner’stale be true, he could have no motive to induce him to avoid the public road — the distance to be gained would be too inconsiderable to furnish one, and therefore this statement is improbable in itself. But Scott proves, that although the fence was formerly about twenty steps from the path, yet having been moved out within a few years past,' it is now within a few feet.
It is impossible therefore, that the prisoner could have gone home along that path — he must have noticed the fence so near it, and the change which had been made since he was along there “a great while ago” would particularly have attracted his attention, and it is easy to account for the distance at which he stated the fence and path to be apart. He refers in his statement to the fact, as it was a great while ago, when he was along there. Then, as Scott proves, the situation of the fence and path were as the prisoner stated; and hence, not being aware that the fence had been moved, he ventured to assert that the position of the path and fence now were as he knew them to have been then;
It is manifest therefore, that the prisoner did not return by the way, in which he states he travelled: and the guilt of another falsehood is fixed upon him. It is equally manifest that he did not return at the time in the evening stated by him, along the ordinary public highway — for he would have seen some one, and would have been seen. Indeed he does not pretend that he travelled the ordinary road; either, therefore, he travelled the back way alledged by him, or he remained in Mrs. Hunter’s neighborhood until after dark, and then went home along the public way. The latter proposition is inevitably true, from all the facts in this part of the case. • Then the question recurs, how are we to account for his trip to that neighborhood; his being there upon false pretences — his remaining until after dark and then returning home, without any ostensible business to detain him — his falsehoods as to the route he travelled — and the time he arrived at home, upon'the supposition of his innocence? But if he be guilty, all these facts are of easy ex-?-planation, and are the natural result of that stale of things.
*300 We now come to the consideration of another fact, which, taken in connection with his conduct for a week previously, is entitled to great weight. On Thursday morning after the murder, á witness (Brown) passed by his house about nine o’clock —his wife and children were digging iron ore, at an ore bank, and the prisoner was lying down asleep — he was waked by the witness, and started up in apparent confusion. If he had enjoyed suitable rest for the several previous nights, his drowsiness at that time of day, without any complaint of indisposition, is not easily accounted for. Nor is his apparent confusion to be overlooked. A man does not ordinarily exhibit it, when awaked from sleep. If the conscience is at ease, and there is no cause for alarm, it is not likely to be felt, or exhibited on such occasions.
But, here, we find this man, whose roving and restless spirit had kept him from home for a week before Tuesday, and who could spare but a short time of that day to his family before he was again off, remaining out Tuesday night and until late Wednesday night, at home on Thursday morning at 9 o’clock, asleep. If he be guilty, he needed repose, after the toil and reconnoitering and watching and arrangements for the execution of the dreadful deed, which for a week past had occupied his time. The tracks of the.horse, and those made by the man near Mrs. Hunter’s window, are strong circumstances against the prisoner. His mare has a hind foot, of peculiar shape. The horse that was tied to the walnut tree, near Mrs. Hunter’s, made a track with one hind foot resembling that which the foot of prisoner’s mare would make. The man’s tracks were measured, and the width of the heel and ball of the foot, precisely corresponded with the prisoner’s shoe. The tracks were made across the ridges of ploughed ground, and there had been rain after they were made, before they were measured. No accurate measure of the length could be obtained, but they appeared a half inch shorter than the prisoner’s shoe. This fact is seized upon by the prisoner’s counsel, as standing opposed to the prisoner’s guilt. Let us examine its force. The tracks, we are told, were made in ploughed ground, across the ridges. The prisoner had on shoes, when apprehended, that he had worn *301 a considerable time. The toe of a coarse shoe, after it has been 'worn some time, turns up somewhat, so that in walking across the ploughing, it would not press firmly on the ground so as to press the earth together and make the track distinct as it would be at the heel and ball of the foot. The consequence would be, that a rain would. easily obliterate that part of the track.made by the toe of the shoe, while the part made by the heel and ball of the foot would not be so easily affected by it. Hence the measure of the width could be well taken, while the length could not. And again: In walking through ploughed land, easily giving way under the foot, it is believed that when the weight of the body is advancing, and is pressing upon the ball of the foot about to be raised to make another step, the natural effect would be, to press the soft earth back with the ball of the foot, and thus make the track somewhat shorter than the shoe.
But be that as it may, the prisoner’s conduct in reference to his shoes, furnishes evidence inconsistent with his innocence. When Snodgrass went into the jail to measure his shoe, he en-quired if the prints of heel irons were seen in the tracks at Mrs. Hunter’s. He was told they were not. Snodgrass then, upon inspection of his shoes, found that they had heel-irons on, and that the irons were old and worn, and the nails with which they were put on. were new. The prisoner said he had put these irons on his shoes Saturday after the murder, and they had not been on before for six months. Pointer, the prisoner’s witness, proved that the irons were on the prisoner’s shoes the 27th of April, when he worked at the witness’ house. The murder was committed the 11th of,May.
From these facts, the necessary inference is, that the prisoner took the irons off his shoes after the 27th of April, and put them on again after Mrs. Hunter was killed. Why he should do ihis, and first challenge the tracks as not being his, for want of the print of the heel irons, and then, when it was found by the new heads of the nails that they had been but recently put on, he should resort to the subterfuge of a falsehood, no one can imagine, unless his shoes had some connection with the tracks at Mrs. Hunter’s.
*302 But it is urged by his counsel, that Snodgrass misunderstood him, and that he could not have intended to admit, that he put these irons on his shoes after Mrs. Hunter’s death. We cannot suppose the witness to be mistaken. The fact, that they were put on with new nails, is conclusive that he is not mistaken as to the prisoner’s admission. Doubtless the detection of that fact by Snodgrass, induced the admission. Nothing could be gained by withholding it, for the new nails would have led to an inference of the same fact; and doubtless he thought by admitting it, and asserting that they had not been on his shoes for six months before, he would avoid the inference, that he had taken them off with a view to the murder and had them put on again. The witness, therefore, stated truly and accurately what occurred. If he had not stated the truth about the new nails with which the old irons were put on, the prisoner, on the trial which occurred shortly afterwards, could have exhibited his shoes and contradicted the witness. This fact, therefore, being clearly established, coupled with the coincidences about the tracks, removes all doubt but that the prisoner was at Mrs. Hunter’s on the night of the murder. Thus we find a train of circumstances, commencing a week before the murder, and accumulating until the fatal night, all consistent with themselves and with each other, all pointing to the establishment of the pri-soncr’s guilt, and each acquiring cogency from its connection with the others, making the prisoner’s innocence utterly inconsistent with these circumstances, and unopposed by a single fact, inconsistent with his guilt.
But it is said, the circumstances strongly implicate Anderson, and that where circumstances equally implicate two, they are not sufficient for the conviction of either. It is true, that where the circumstances equally implicate two persons, having no connection with each other, they are not sufficient for the conviction of either. But it is not the case, where the two are shown tobe connected in such way as to have a common purpose for the perpetration of the same deed. In such case, every circumstance that contributes to fix the guilt on one fixes it equally on both. Such is the present case. Anderson and the prisoner were together before the murder; they had a mis- *303 terious conversation at dinner, before the family, about the sale of the gun. Kirby was to have the gun, if he found a cow, and yet we hear nothing said about the cow afterwards, although Kirby gets the gun. Kirby went back towards Anderson’s Tuesday evening after he had received the gun. On Wednesday night Kirby was in the neighborhood of Mrs. Hunter’s until after dark. And Anderson left home after dinner on Wednesday, took provisions and said he was going to Overton county, but returned home late the same night. On Friday after the murder, Kirby was again at Anderson’s, and they were together in the field for -a short time. On Saturday Kirby was arrested, and Anderson fled the country the same day. Add to this, that Mrs. Hunter was lulled by a ball shot from Anderson’s rifle, which had been delivered by him to Kirby on Tuesday; and the connection between them, and their concert of action and probable presence of both at Mrs. Hunter’s on the night of the murder, is established beyond a reasonable doubt.
The evidence which tends to fix guilt upon Anderson, in our view, fastens it more strongly on Kirby, than if there were less evidence against Anderson. ■ '
In reviewing the whole case, and talcing into view, that shortly before the murder the prisoner took the heel irons from his shoes, and put them on again after the murder; his absence from home, unexplained and unusual, for a week before the murder; the tracks resembling his, seen by Mary Ann Todd, in the orchard near the house several days before the murder; the obtaining the gun from Anderson, and the fact that the ball by which the deceased was killed, was shot from Anderson’s gun; the concealment of the gun on Tuesday after he had obtained it; going home and returning on horseback late in the evening; not being able to give any account as to where he was on Tuesday night; his falsehoods to Price and Scott, and John Kirby, as to his motives for going into Mrs. Hunter’s neighborhood; his falsehood as to the road he travelled home, and the improbability that he could have travelled the ordinary way before night and not have been seen; being found asleep at 9 o’clock in the morning of the day after the murder; the coincidence of the tracks of the mare with those of his nag, and of the man *304 with his own; the falsehoods introduced in explanation of his conduct; and last, the absence of Anderson from home on Wednesday night until late; Kirby’s visit to him on Friday, and his flight on Saturday when Kirby was arrested, all tend so strongly to the establishment of his guilt, that we think the jury were fully warranted in the verdict they have rendered against him.
But it is not to be understood by what the court say, in the case of Dains vs. The State, (2 Hum. Rep.) that the verdict of a jury in a criminal case, weighs nothing with this court, and that a new trial will be granted, if upon the evidence certified in the bill of exceptions we are not convinced beyond a reasonable doubt of the guilt of the party. On the contrary, the jury are the exclusive judges of the credit of the witnesses, and in all cases much must occur before the court and jury properly calculated to act upon their minds, which cannot be transferred to paper. A verdict, therefore, in all cases, must have great weight with this court.
All we mean to say in Dains’ case is, that the rule, in the strong langnage in which it is so frequently laid down in civil cases, does not apply, as there stated, to criminal causes.
We find no error in this record, and the judgment must be affirmed.